ARROW FASTENER CO., INC., ET AL.,[1] PETITIONERS v.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5468–77—5470–77.     Filed March 12, 1981.

*Elliot I. Miller*, for the petitioners.
*Patrick E. Whelan*, for the respondent.

### OPINION

WILBUR, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Docket No. | Petitioner(s) | Taxable period | Deficiency |
|---|---|---|---|
| 5468–77 | Arrow Fastener Co., Inc | [1]1973 | $157,724.50 |
| 5469–77 | Arrow Fastener International, Ltd | [1]1973 | 13,254.19 |
| 5470–77 | Arrow Fastener Sales Corp | 1973 | 30,957.29 |

[1] Oct. 1, 1972, through Sept. 30, 1973.

We are asked to pass on the validity of a regulation applying to Domestic International Sales Corporations (DISCs). Congress provided special tax benefits to DISCs to encourage exports, but required that 95 percent of their assets be "qualified export assets." Section 993(b)(7)[2] states that obligations of the Export-Import Bank of the United States (Ex-Im Bank obligations) are qualified export assets. Section 1.993–2(h)(2), Income Tax Regs., disqualifies Ex-Im Bank obligations to the extent their adjusted

---

[1]Cases of the following petitioners are consolidated herewith: Arrow Fastener International, Ltd., docket No. 5469–77; Arrow Fastener Sales Corp., docket No. 5470–77.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

bases exceed accumulated DISC income. The validity of this limitation is the sole issue presented.[3]

This case was submitted fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Arrow Fastener Co., Inc. (hereinafter referred to as Arrow), is a corporation organized on October 28, 1966, under the laws of the State of New Jersey. At the time of the filing of the petition in this case, Arrow's principal place of business was located in Saddle Brook, N.J.

Arrow Fastener Sales Corp. (hereinafter referred to as Sales) is a corporation organized on May 17, 1972, under the laws of the State of New Jersey. At the time of the filing of the petition in this case, Sales' principal place of business was located in Saddle Brook, N.J.

Arrow Fastener International, Ltd. (hereinafter referred to as International), is a corporation organized on February 14, 1968, under the laws of the State of New Jersey. At the time of the filing of the petition in this case, International's principal place of business was located in Saddle Brook, N.J.

Since its incorporation, Arrow has been engaged in the business of manufacturing stapling machines and staples. Sales and International are both wholly owned subsidiaries of Arrow engaged in the business of exporting stapling machines and staples.

On or about July 31, 1972, Sales made a valid election under section 992(b) to be treated as a DISC. On December 20, 1972, Sales purchased an obligation in the amount of $1,011,040.67 issued by the Export-Import Bank of the United States due April 30, 1973. Sales was inactive during its first taxable year ending December 31, 1972, and thus reported no income, deductions, or accumulated DISC income on its Federal income tax return for 1972. The obligation referred to above, having been held on December 31, 1972, was listed as an asset on the corporation's balance sheet on the return.

Subsequent to the redemption of the aforementioned Ex-Im Bank obligation, Sales purchased another Ex-Im Bank obliga-

---

[3]Petitioners also challenge the right of respondent to apply the regulation retroactively. In view of our decision on the validity of the regulation, it is unnecessary to reach this issue.

tion on May 9, 1973, which was due on May 4, 1974, in the amount of $985,854.17. This Ex-Im Bank obligation was held by Sales on December 31, 1973, and was shown as an asset on Schedule L of Sales' 1973 Federal income tax return, filed with the District Director, Brookhaven Service Center, Holtsville, N.Y. The 1973 return revealed two sources of income: qualified export receipts from the sale of export property of $637,369.33, and interest on the Ex-Im Bank obligations of $51,648.96. After subtracting cost of goods sold of $290,003.05, gross income was reported as $399,015.24. Accumulated DISC income was shown as $156,341.37.

In his statutory notice of deficiency, respondent determined that Sales did not qualify as a DISC for its taxable year 1973 because, as of the close of that year, its basis in Ex-Im Bank obligations exceeded its accumulated DISC income by approximately $620,000, and pursuant to the regulation in issue (sec. 1.993–2(h)(2), Income Tax Regs.), this excess investment was not a qualified export asset. If respondent is correct, Sales fails to meet the requirement of section 992(a)(1)(B) that 95 percent of its assets be qualified export assets.[4]

On or about October 1, 1972, International made a valid election under section 992(b) to be treated as a DISC. At the close of its taxable year ending September 30, 1973, International had total assets of $1,233,568.50 ($1,093,148.46 of working capital and $140,420.04 of trade receivables). On its 1973 Federal income tax return filed with the District Director, Brookhaven Service Center, Holtsville, N.Y. International reported gross income of $580,385.77 ($1,064,928 in qualified export receipts from the sale of export property less $484,542.23 cost of goods sold). The sale of export property was International's only reported source of income. Accumulated DISC income at the end of its fiscal year 1973 was $202,260.03.

On November 16, 1973, International purchased an Ex-Im Bank obligation at a cost of $990,000, with a maturity of May 4, 1974. This obligation was renewed on May 10, 1974, at a cost of $971,875. International held the original Ex-Im Bank obligation

---

[4]Sec. 992(a)(1)(A) requires 95 percent of a DISC's gross receipts to be from qualified export receipts, which includes interest on a qualified export asset. To the extent Sales' Ex-Im Bank obligations are not qualified export assets, the income therefrom is not qualified export receipts and the requirements of sec. 992(a)(1)(A) are not met. Respondent makes this argument, but it also turns solely on the validity of sec. 1.993–2(h)(2), Income Tax Regs.

at the close of the sixth and seventh months following the end of its 1973 taxable year, and held the renewed obligation at the end of the eighth month. The adjusted basis of these obligations exceeded International's accumulated DISC income at the end of each of the sixth, seventh, and eighth months by approximately $500,000.

Section 993(b)(4) and the regulations thereunder treat money, bank deposits, and other similar temporary investments which are reasonably necessary to meet the working capital requirements of the corporation as qualified export assets. The respondent determined that of the $1,093,148.46 reported by International as working capital at the end of the taxable year 1973, over $1 million of this amount was in excess of the working capital requirements of the corporation ("excess working capital") pursuant to section 1.993–2(e), Income Tax Regs., and thus did not constitute qualified export assets.[5]

However, under section 993(b)(9), amounts on deposit in the United States, other than reasonable working capital, can constitute qualified export assets if used within the period prescribed in the regulations to acquire other qualified export assets.[6] Thus, International's bank deposits in the United States, to the extent they were in excess of required working capital, were treated by the respondent as "funds awaiting investment" at the close of the taxable year 1973 in accordance with section 1.993–2(j), Income Tax Regs.

"Funds awaiting investment" are treated as qualified export assets (see sec. 1.993–2(a)(9), Income Tax Regs.) only if two tests are met. First, they must be bank deposits in the United States, at the end of the taxable year, in excess of required working

---

[5]The relevant portion of sec. 1.993–2(e), Income Tax Regs., provides:

(e) *Temporary investments*—(1) *In general.* For purposes of this section, temporary investment are money, bank deposits (not including time deposits of more than 1 year), and other similar temporary investments to the extent maintained by a DISC as reasonably necessary to meet its requirements for working capital. * * *

[6]Sec. 993(b)(9) provides:

SEC. 993. DEFINITIONS.

(b) QUALIFIED EXPORT ASSETS.—For purposes of this part, the qualified export assets of a corporation are—

*     *     *     *     *     *     *

(9) amounts (other than reasonable working capital) on deposit in the United States that are utilized during the period provided for in, and otherwise in accordance with, regulations prescribed by the Secretary to acquire other qualified export assets.

capital. Second, the funds must be reinvested in qualified export assets after the end of the taxable year. The reinvestment requirement is met if on the last day of each of the sixth, seventh, and eighth month after the close of the taxable year the sum of the bases of the qualified export assets equals or exceeds 95 percent of the sum of the adjusted basis of all assets held on the last day of the taxable year.[7] International timely invested the "funds awaiting investment" in Ex-Im Bank obligations. Nevertheless, respondent concluded that International did not meet the qualified export asset test (sec. 992(a)(1)(B)) due to the excess of Ex-Im Bank obligations over accumulated DISC income at the end of each of the months referred to above. (Sec. 1.993–2(h)(2), Income Tax Regs.) This again requires that we pass on the validity of section 1.993–2(h)(2), Income Tax Regs.

During its taxable year ended September 30, 1973, Arrow engaged in sales transactions with its subsidiaries, Sales and International, and on its 1973 Federal income tax return filed with the District Director, Brookhaven Service Center, Holtsville, N.Y., reported income received from these transactions. Additionally, Arrow reported a deemed dividend from International.[8] The respondent issued notices of deficiency to Arrow,

---

[7]The relevant portions of sec. 1.993–2(a) and (j), Income Tax Regs., provide:

Sec. 1.993–2. Definition of qualified export assets.

(a) *In general.* * * * Under section 993(b), the qualified export assets held by a corporation are—

\*      \*      \*      \*      \*      \*      \*

(9) Funds awaiting investment described in paragraph (j) of this section.

\*      \*      \*      \*      \*      \*      \*

(j) *Funds awaiting investment*—(1) *In general.* For purposes of this section, subject to the limitation described in subparagraph (2) of this paragraph, if, at the close of a DISC's taxable year, the sum of the DISC's money, bank deposits, and other similar temporary investments is determined under paragraph (e) of this section to exceed an amount reasonably necessary to meet the DISC's requirements for working capital, the amount of the DISC's bank deposits in the United States to the extent of the amount of this excess are funds awaiting investment at the close of such taxable year.

(2) *Limitation.* Bank deposits described in subparagraph (1) of this paragraph are funds awaiting investment only if by the last day of each of the sixth, seventh, and eighth months after the close of such taxable year, the sum of the adjusted bases of the qualified export assets of the DISC (other than such bank deposits) equals or exceeds 95 percent of the sum of the adjusted bases of all assets of the DISC (including such bank deposits) it held on the last day of such taxable year. * * *

[8]No deemed dividend was reported from Sales for its taxable year 1973, even though there was a deemed distribution to Arrow of $156,341.37, since Sales' taxable year 1973 ended on Dec. 31, 1973, which was during the 1974 taxable year of Arrow. Sec. 995(b)(1). There was no

International, and Sales, for their taxable year 1973, based on the disqualification of Sales and International as DISCs.[9]

These cases concern the qualification of Arrow's two subsidiaries (Sales and International) as Domestic International Sales Corporations (DISCs). Respondent determined that both Sales and International failed to qualify as DISCs for their 1973 taxable years. Sales is alleged to have failed the qualified export assets test of section 992(a)(1)(B), and, consequently, the qualified export receipts test of section 992(a) (1)(A).[10] International is alleged to have violated section 992(a)(1)(B). In both cases, the underlying basis for the respondent's determination is that a portion of the Export-Import Bank obligations (Ex-Im Bank obligations) held by each corporation are not qualified export assets under the regulation.

At the heart of this controversy is one of the respondent's regulations, section 1.993–2(h)(2), whose validity is being challenged. We agree with the petitioners that the regulation is invalid.

In 1971, Congress enacted sections 991 to 997 giving special tax treatment to corporations which qualified under section 992 as DISCs. The requirements for qualification are stringent. Two of these requirements, sections 992(a)(1)(A) and 992(a)(1)(B),

---

deemed distribution from Sales to Arrow for Sales' 1972 taxable year as Sales had no taxable income at that time.

[9]The parties have stipulated that if the Court determines Sales and International to be qualified as DISCs for their taxable year 1973, neither corporation would be liable for any Federal income tax for such year. In such an event, however, the intercompany pricing rules of sec. 994 would be applicable, and income reported by Sales and International in 1973 would be allocable to Arrow, and there would be a corresponding reduction in the deemed dividend reported by Arrow from International. If, on the other hand, we find that Sales and International are not taxable as DISCs, the parties have agreed to the specific reallocation of income and deductions that must be made under sec. 482, and there would be no deemed dividends to Arrow. The various adjustments between the corporations have been specified in the stipulation, and we see no need to add to the inevitable complexity of this opinion by repeating them here.

[10]Sec. 992(a) provides in pertinent part:

SEC. 992. REQUIREMENTS OF A DOMESTIC INTERNATIONAL SALES CORPORATION.

    (a) DEFINITION OF "DISC" AND "FORMER DISC".—

        (1) DISC.—For purposes of this title, the term "DISC" means * * * a corporation which * * * satisfies the following conditions for the taxable year:

            (A) 95 percent or more of the gross receipts (as defined in section 993(f)) of such corporation consist of qualified export receipts (as defined in section 993(a)),

            (B) the adjusted basis of the qualified export assets (as defined in section 993(b)) of the corporation at the close of the taxable year equals or exceeds 95 percent of the sum of the adjusted basis of all assets of the corporation at the close of the taxable year.

depend in part upon the amount of "qualified export assets" held by the corporation. Section 993(b)[11] lists various types of property which will be considered "qualified export assets." This list includes obligations issued by the Export-Import Bank of the United States. Sec. 993(b)(7). This paragraph contains no limitation on its face as to the amount of such obligations which can be held as "qualified export assets."

Nevertheless, respondent has promulgated regulations that limit the amount of Ex-Im Bank obligations which are to be considered as "qualified export assets" to (the lesser of the adjusted basis of such obligations or) the amount of accumulated DISC income reduced by the amount of outstanding producer's loans. Challenge has been made only to section 1.993–2(h)(2), Income Tax Regs.,[12] and we will deal solely with the validity of

---

[11]Sec. 993(b) provides in pertinent part:

SEC. 993. DEFINITIONS.

(b) QUALIFIED EXPORT ASSETS.—For purposes of this part, the qualified export assets of a corporation are—

\* \* \* \* \* \* \*

(4) money, bank deposits, and other similar temporary investments, which are reasonably necessary to meet the working capital requirements of such corporation;

(5) obligations arising in connection with a producer's loan (as defined in subsection (d));

\* \* \* \* \* \* \*

(7) obligations issued, guaranteed, or insured, in whole or in part, by the Export-Import Bank of the United States or the Foreign Credit Insurance Association in those cases where such obligations are acquired from such Bank or Association or from the seller or purchaser of the goods or services with respect to which such obligations arose;

\* \* \* \* \* \* \*

(9) amounts (other than reasonable working capital) on deposit in the United States that are utilized during the period provided for in, and otherwise in accordance with, regulations prescribed by the Secretary or his delegate to acquire other qualified export assets.

[12]Sec. 1.993–2(h)(2), Income Tax Regs., reads as follows:

Sec. 1.993–2. Definition of qualified export assets.

(2) *Limitation on Export-Import Bank obligations and financing obligations acquired after November 3, 1972.* Obligations acquired by a DISC after November 3, 1972, and satisfying (without regard to this subparagraph) the requirements of subparagraph (1) of this paragraph or paragraph (i)(1) of this section, will qualify as Export-Import Bank obligations or as financing obligations (as the case may be) only to the extent that, on the applicable determination date described in subparagraph (3) of this paragraph, the sum of the adjusted bases of such obligations (as determined under section 1011) does not exceed the amount of the DISC's accumulated DISC income on that date, reduced by the sum of—

(i) The amount of producer's loans of the DISC outstanding on such date and

(ii) The adjusted bases of obligations held by the DISC on the applicable determination date (other than the ones being tested) which satisfy (without regard to this subparagraph) the requirements of subparagraph (1) of this paragraph or paragraph (i) of this section (including obligations acquired on or before November 3, 1972).

this portion of the regulations under section 993(b)(7).[13]

The Commissioner has broad authority to promulgate all needful regulations. Sec. 7805(a). It is well settled that Treasury regulations "must be sustained unless unreasonable and plainly inconsistent with the statutes." As they constitute contemporaneous constructions by those charged with administration of these statutes, they "should not be overruled except for weighty reasons." *Bingler v. Johnson*, 394 U.S. 741, 750 (1969); *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 601 (1948); *Fawcus Machine Co. v. United States*, 282 U.S. 375, 378 (1931).

It is equally clear, however, that the regulations must be harmonious with the statute, and a regulation which is in conflict with the statute is invalid to that extent. *Citizen's National Bank of Waco v. United States*, 417 F.2d 675 (5th Cir. 1969). Where the provisions of the statute are unambiguous and its directive specific, there is no power to amend it by regulations. *Koshland v. Helvering*, 298 U.S. 441, 447 (1936).

The statute clearly and unequivocally states that "obligations issued, guaranteed, or insured, in whole or in part, by the Export-Import Bank of the United States" are "qualified export assets." Congress apparently felt that the importance of the policies subserved by Ex-Im Bank in facilitating exports warranted this treatment.[14] Certainly, Congress knew how to frame exceptions if it so wished, for in dealing with producer's loans, it included a limitation in the statute that resembles the limitations on Ex-Im Bank obligations included in the regulation here in question (see sec. 993(d)(1)(A)). If Congress had contemplated the application of a similar limitation on Ex-Im Bank obligations, it would have provided it, or in the context of the statute we are considering, provided specifically for regulations incorporating such a limitation.

---

[13]The apparent infirmity of this regulation has not escaped attention. See R. Feinschreiber, Domestic International Sales Corporations 168 (Practising Law Institute 1978).

[14]Congress, in creating the Ex-Im Bank, set forth the following policy objectives:

"It is the policy of the United States to foster expansion of exports of goods and related services, thereby contributing to the promotion and maintenance of high levels of employment and real income and to the increased development of the productive resources of the United States. To meet this objective, the Export-Import Bank is directed, in the exercise of its functions, to provide guarantees, insurance, and extensions of credit at rates and on terms and other conditions which are competitive with the Government-supported rates and terms and other conditions available for the financing of exports from the principal countries whose exporters compete with United States exporters. * * * [12 U.S.C. sec. 635(b)(1)(A).]"

Congress followed the latter course in several instances in the statutory provisions relating to DISCs. We note that the statute specifically authorizes respondent to draft regulations for qualified export assets encompassed by section 993(b)(9) (relating to funds awaiting investment). Additionally, the statute specifically authorizes respondent to draft regulations excluding from "qualified export receipts" income derived under special circumstances from the "sale, exchange, lease, rental, or other disposition of export property, and from services." (Sec. 993(a)(2).) See also sec. 992(a)(2).

There are other aspects of the statute before us that convince us that respondent has inappropriately promulgated regulations amending the statute. For example, section 993(b)(4) expressly limits the amount of cash, bank deposits, and other temporary investments constituting qualified export assets to those "reasonably necessary to make the working capital requirements of such corporation." In contrast, the statute contains no limitations of any kind on the Ex-Im Bank obligations which may qualify as export assets.

In short, we find the statute clear and unambiguous, and respondent has no power to promulgate a regulation adding provisions that he believes Congress should have included. *Helvering v. Credit Alliance Corp.*, 316 U.S. 107 (1942); *Commissioner v. Callahan Realty Corp.*, 143 F.2d 214 (2d Cir. 1944); *Caterpillar Tractor Co. v. United States*, 218 Ct. Cl. 517, 589 F.2d 1040 (1978); 1 J. Mertens, Law of Federal Income Taxation, sec. 3.21, p. 46 (1974 rev.).

Respondent nevertheless contends that the regulation in question merely interprets the statute in a reasonable way by excluding a corporation from qualification unless it is substantially engaged in exporting. The regulation produces this result, respondent argues, by affording preferential treatment to accumulated DISC income that is used to acquire qualified export assets. Respondent notes that this is consistent with the legislative history which states that "substantially all of the [DISC's] gross receipts and assets must be export related." H. Rept. 92–533 (1971), 1972–1 C.B. 498, 503; S. Rept. 92–437 (1971), 1972–1 C.B. 559, 565.

Respondent has made the best of a very poor case, but he simply begs the question. Of course Congress required substantially all of a DISC's receipts and assets to be "export related,"

and then went on to spell out what it meant with some particularity. We must decide what assets are sufficiently export related to be qualified export assets—do export related assets include Ex-Im Bank obligations as provided in the statute by Congress, or only those Ex-Im Bank obligations not in excess of accumulated DISC income, as provided in the regulations by respondent. We believe, for the reasons stated, that Ex-Im Bank obligations qualify without the limitations provided by respondent.

Respondent's concern that inactive or investment-type activities may qualify for a DISC was addressed by Congress in providing that a personal holding company is ineligible to be a qualified DISC (sec. 992(d)(2)). We also note that section 993(b)(4) and section 993(b)(9) limit the amount of nonworking capital a DISC may hold. These provisions may not be as complete as respondent would have drafted, but he may not complete them by disqualifying Ex-Im Bank obligations as export assets that plainly qualify under the statute.[15] The statute is clear, and the legislative history does not in any way indicate that Congress contemplated any such limitation as the Commissioner has provided in regulations section 1.993–2(h)(2). See Conf. Rept. 92–553 (1971), 1972–1 C.B. 644, 666; S. Rept. 92–437 (1971), 1972–1 C.B. 559, 565, 614; H. Rept. 92–533 (1971), 1972–1 C.B. 498, 502, 534.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

---

[15]Respondent notes in his brief that Sales and International both meet the stock ownership requirement of sec. 542(a)(2) for treatment as a personal holding company under sec. 541, but does not advance any reason for his failure to invoke those sections. One reason might be that for the taxable year here in question, slightly more than 87 percent of Sales' receipts were due to the sale of export property. For International, the figure was 100 percent. Only Sales had passive income (interest from the Ex-Im Bank obligations), $51,648.96 out of $399,015.24 of gross income. Even if this computation were performed after the sec. 482 income reallocation and assuming that no passive income (interest) is reallocated, the percentage for Sales is still 66.8 percent. In both instances, the 60-percent target of sec. 542(a)(1) is met. See secs. 542 and 543. These figures indicate that, contrary to respondent's contentions, both corporations were in fact actively engaged in exporting their products.